UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X
JAVIER PEREZ,                                          :

               Petitioner,               :

           -against-                     :      **REPORT and RECOMMENDATION**

ROBERT ERCOLE,                                         :      09 Civ. 2180 (WHP)(KNF)

              Respondent.               :
-------------------------------------------------------X
KEVIN NATHANIEL FOX
UNITED STATES MAGISTRATE JUDGE

TO THE HONORABLE WILLIAM H. PAULEY III, UNITED STATES DISTRICT JUDGE

## INTRODUCTION

In 2005, upon entry of a guilty plea, the New York State Supreme Court, New York
County, convicted Javier Perez ("Perez") of first-degree assault and sentenced him to a
determinate term of 23 years' imprisonment. On October 16, 2007, the New York State Supreme
Court, Appellate Division, First Department, affirmed Perez's conviction and sentence
unanimously, see People v. Perez, 44 A.D.3d 441, 843 N.Y.S.2d 278 (App. Div. 1st Dep't 2007),
and, on December 18, 2007, the New York Court of Appeals denied Perez leave to appeal. See
People v. Perez, 9 N.Y.3d 1008, 850 N.Y.S.2d 396 (2007).

Before the Court is Perez's petition for a writ of habeas corpus, pursuant to 28 U.S.C. §
2254. Perez asserts two grounds to challenge the constitutionality of his confinement by New York
State. First, Perez contends the state trial court erred in not suppressing his statements to law

enforcement agents because: (a) he was not given Miranda[1] warnings at the start of a custodial

interrogation; and (b) his subsequent statements were "taint[ed]" by the initial Miranda violation.

Second, Perez claims his sentence is "harsh and excessive."

## BACKGROUND AND PROCEDURAL HISTORY

On November 30, 2001, Salathiel Duarte ("Duarte") drove Rafael Rios ("Rios"), Raymond

Mundo ("Mundo"), and Perez to an apartment building, on East 101st Street, in Manhattan.  Rios

and Mundo entered the building, while Perez waited in front of a nearby bodega, with instructions to

whistle if police appeared.  Perez believed Rios and Mundo intended to commit a burglary[2] only, but

"expected" them to carry weapons for such a task.  Once in the building, Rios and Mundo entered

Carmen Quinones' apartment and fatally stabbed her and her boyfriend, Ruben Frederick.

On December 11, 2003, Perez and his wife drove to Manhattan so Perez could attend an

appointment with his probation officer, Officer Isaac ("Isaac"), at 2:00 p.m.  At approximately 3:00

p.m., Isaac led Perez to a room, in the probation office, where Investigator Genarro Giorgio

("Giorgio") and Detectives Lynch ("Lynch") and Freitag ("Freitag") were seated.  The men

introduced themselves to Perez, told him they were conducting an investigation and asked him to

"join [them] and go up to the 23rd Precinct."  Perez agreed to go with the men; however, had he

refused, Giorgio later testified, he would have been arrested.

---

[1] The Supreme Court has held that an individual subjected to custodial interrogation, by law
enforcement personnel, "must be warned prior to any questioning that he has the right to remain silent,
that anything he says can be used against him in a court of law, that he has the right to the presence of an
attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if
he so desires."  Miranda v. Arizona, 384 U.S. 436, 479, 86 S. Ct. 1602, 1630 (1966).  "[U]nless and until
such warnings and waiver are demonstrated by the prosecution at trial, no evidence obtained as a result
of interrogation can be used against" an accused.  Id.

[2] At times, in his submissions, Perez contends he believed Rios and Mundo planned to commit a
robbery.

2

Giorgio, Lynch, Freitag, Isaac and Perez exited the office and walked toward the waiting room where Perez's wife sat.  Perez spoke to his wife and gave her their car keys.  Giorgio told Perez's wife she could come to the 23rd police precinct to see her husband, if she desired.  Perez's wife rode the elevator down, with the five men, to exit the building.  Lynch and Freitag drove Perez to the 23rd police precinct in an unmarked police vehicle; Giorgio drove separately.

At approximately 4:00 p.m., Perez reached the precinct.  Once there, the detectives ushered Perez into an interview room, where he sat alone for five to ten minutes, while Giorgio, Lynch, Freitag and Detective Antonio Rivera ("Rivera") decided who would conduct Perez's interview.  The detectives did not handcuff Perez, prior to placing him in the interview room, and no one guarded the room in which he sat.

Thereafter, Giorgio entered the interview room to join Perez.  Giorgio reintroduced himself and said to Perez, "I'm going to show you some photographs."  Giorgio removed three photographs – of Mundo, Rios and Duarte – from a folder and placed them on the table in front of Perez.  Perez looked at the photographs and said, "[O]h yeah, I know those people."  Giorgio did not respond and, within a minute, Lynch entered the room to tell Giorgio that he and Rivera would conduct the interview.  Giorgio left the room.

Rivera entered, introduced himself to Perez and explained that he would be speaking with Perez about a murder that occurred in 2001.  Rivera then read Perez his Miranda rights, in Spanish.  Perez signed and dated the paper from which Rivera read.  Rivera asked Perez to tell him what occurred, to which Perez responded "whatever you need."  Perez proceeded to admit his role as a lookout the night of the murders.  During the interview, Perez spoke to Rivera in Spanish, Rivera translated to English, and Lynch wrote the statement in English.  Lynch read the statement to Perez in English, Perez said he understood its contents and signed it at approximately 5:30 p.m.

3

After signing the statement, Perez agreed to make a video-recorded statement.  Giorgio, Lynch, Freitag, Rivera and Perez left the 23rd police precinct for the Manhattan District Attorney's office.  Giorgio, again, drove separately, while Rivera sat in the back of the unmarked police vehicle with Perez, who remained unrestrained.  At approximately 7:00 p.m., Giorgio, Lynch and Rivera met with Assistant District Attorney Ann Prunty ("Prunty"), while Perez waited in an adjoining room with Freitag.  Prunty requested that Rivera question Perez further about his role in the murders and whether he had received any proceeds from the crime.  Rivera and Lynch returned to Perez and questioned him, as they had at the police precinct.  Lynch read the second statement to Perez in English, Perez said he understood its contents and signed it at approximately 9:00 p.m.

The group, including Perez, then ordered and ate dinner.  At approximately 11:00 p.m., Prunty commenced the videotaped interview of Perez, in the presence of a court interpreter and Giorgio.  Before asking any questions, Prunty advised Perez of his Miranda rights.  During the interview, Perez admitted his role in the crime.  The interview concluded at approximately 12:30 a.m.

Perez was charged with four counts of first-degree murder, two counts of second-degree murder and felony murder.  On August 9, 2004, the New York State Supreme Court held a hearing to address Perez's motion to suppress all statements he made to law enforcement agents.  On September 7, 2004, the court denied Perez's suppression motion in all respects.  The court determined Perez was not in custody when the detectives met him at the probation office and that "Giorgio's display of the three photographs did not constitute interrogation or the functional equivalent of interrogation."

On January 25, 2005, the second day of jury selection, Perez withdrew his plea of not guilty and entered a plea of guilty to the lesser-included offense of first-degree assault, see New York Penal Law

4

§ 120.10(4), in full satisfaction of his indictment.  On February 18, 2005, the court sentenced Perez to a determinate sentence of 23 years' imprisonment.

Perez appealed his judgment of conviction, raising the same two grounds he now asserts in his habeas corpus petition.  On October 16, 2007, the Appellate Division, First Department, affirmed Perez's conviction and sentence unanimously.  See Perez, 44 A.D.3d at 441, 843 N.Y.S.2d at 278.  The Appellate Division found that the trial court "properly denied [Perez]'s motion to suppress statements he made to the police and an assistant district attorney."  Id., 44 A.D.3d at 441, 843 N.Y.S.2d at 279.  The court determined Perez was not in custody prior to receiving Miranda warnings and that "[p]lacing the photographs on the table neither rendered the interview custodial nor constituted a form of interrogation."  Id., 44 A.D.3d at 442, 843 N.Y.S.2d at 279.  Moreover, the court declined to reduce Perez's sentence.  Id.

By letter application, dated November 16, 2007, Perez, through counsel, sought leave to appeal to the New York Court of Appeals.  In the letter, addressed to the chief judge of the Court of Appeals, Perez requested "the opportunity to file a supplemental letter with the judge to whom this matter is assigned, addressing in greater detail the reasons why the Court should review [t]his case and how the issues are preserved for this Court's review."  Perez attached, to the letter, his briefs to the Appellate Division.  In a six-page supplemental letter, dated December 5, 2007, Perez, again through counsel, requested that the Court of Appeals "grant leave to appeal in order to resolve the issue of whether the police orchestration of a suspect's apprehension at a parole o[r] probation office impacts upon the determination of whether an ensuing interrogation was custodial."

On December 18, 2007, the Court of Appeals denied Perez leave to appeal.  See Perez, 9 N.Y.3d at 1008, 850 N.Y.S.2d at 396.  Perez filed the instant petition timely, on February 4, 2009.

**DISCUSSION**

**I. Exhaustion of State Remedies**

A state prisoner must exhaust available state remedies before filing a habeas corpus petition in federal court.  See 28 U.S.C. § 2254(b)(1), (c).  Exhaustion of state remedies requires that a prisoner "fairly present[]," to the state courts, the claims ultimately raised in his habeas corpus petition. O'Sullivan v. Boerckel, 526 U.S. 838, 848, 119 S. Ct. 1728, 1734 (1999).  To do so, the prisoner "must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process."  Id., 526 U.S. at 845, 119 S. Ct. at 1732. Moreover, the prisoner must alert the state courts to the fact that he is "asserting claims under the United States Constitution."  Duncan v. Henry, 513 U.S. 364, 366, 115 S. Ct. 887, 888 (1995).

In New York, "a criminal defendant must first appeal his or her conviction to the Appellate Division, and then must seek further review of that conviction by applying to the Court of Appeals for a certificate granting leaving to appeal."  Galdamez v. Keane, 394 F.3d 68, 74 (2d Cir. 2005), cert. denied, 544 U.S. 1025, 125 S. Ct. 1996 (2005).  A habeas corpus petitioner need not have "expressly request[ed] review" of all claims in the appellate briefs attached to his application for leave to appeal if the "'fair import' of the total application suggests a request for review of all issues argued to the Appellate Division."  Id. at 76 (omitting citations) (construing two letter applications, that specified no claims for review, as requesting review of all issues in attached appellate briefs); see Jordan v. Lefevre, 206 F.3d 196, 199 (2d Cir. 2000) (noting that letter making "no argument in detail" would have fairly presented all claims in attached appellate briefs to the Court of Appeals).  If a petitioner's initial leave application "affirmatively directed the Court of Appeal's [sic] attention away from claims contained in the attached briefs," the district court may conclude the petitioner only fairly presented the claims in the letter.  Galdamez, 394 F.3d at 76; see, e.g., Grey v. Hoke, 933 F.2d 117, 120 (2d Cir. 1991) (holding that

petitioner abandoned, on appeal, two of the three claims contained in his appellate briefs where his initial letter application only argued one claim). However, it would be inappropriate "to infer that the New York Court of Appeals would construe counsel's second letter as eliminating issues as to which review" had been sought in the initial letter application. Morgan v. Bennett, 204 F.3d 360, 371 (2d Cir. 2000), cert. denied, 531 U.S. 819, 121 S. Ct. 59 (2000).

Perez's initial letter application did not specify any particular claim for review. Rather, the letter, to which Perez's appellate briefs were attached, requested an opportunity to file a "supplemental letter" to "address[] in greater detail" why leave to appeal should be granted. See New York Court of Appeals Rules of Practice § 500.20(a) (permitting applicants seeking leave to appeal to "file additional submissions" once their application is assigned to a judge on the Court of Appeals). By labeling his second letter "supplemental," Perez suggested, to the Court of Appeals, that the argument raised therein should "be considered in addition to, not in lieu of or as a limitation on, the issues raised in counsel's initial letter." Morgan, 204 F.3d at 371. As Perez's initial leave letter did "not communicate to the Court of Appeals that it should focus on some claims to the exclusion of others," see Galdamez, 394 F.3d at 76, the Court deems that it requested review of all claims raised in the attached appellate briefs. Accordingly, Perez's Miranda claims were fairly presented to the state courts. However, his excessive sentence claim is unexhausted, as his appellate briefs do not alert the state courts of the constitutional nature of his claim, but rather, rely on the appellate courts' discretionary power, under state law, to reduce sentences. See Bell v. Ercole, 631 F. Supp. 2d 406, 418 (S.D.N.Y. 2009).

**II. Merits Analysis**

**A. Miranda Violations[3]**

_____

[3]The respondent mistakenly contends Perez's Miranda claims are barred, because his conviction resulted from a guilty plea. It is true that, generally, a criminal defendant who pleads guilty to a charged
(continued...)

"<u>Miranda</u> warnings are required only where there has been such a restriction on a person's freedom as to render him 'in custody.'" <u>Oregon v. Mathiason</u>, 429 U.S. 492, 495, 97 S. Ct. 711, 714 (1977) (<u>per</u> <u>curiam</u>). Two inquiries are required to make the "'in custody' determination." <u>Thompson v. Keohane</u>, 516 U.S. 99, 112, 116 S. Ct. 457, 465 (1995). First, a court must consider "the circumstances surrounding the interrogation." <u>Id.</u> Second, the court must ask whether "given those circumstances, [] a reasonable person [would] have felt . . . not at liberty to terminate the interrogation and leave." <u>Id.</u> "The <u>Miranda</u> custody inquiry in an objective test." <u>Yarborough v. Alvarado</u>, 541 U.S. 652, 667, 124 S. Ct. 2140, 2151 (2004).

The record in this case supports the state court's determination that Perez was not in custody prior to the police administering <u>Miranda</u> warnings to him. Perez voluntarily agreed to accompany the law enforcement agents from the probation office to the 23rd police precinct. <u>See</u> <u>California v. Beheler</u>, 463 U.S. 1121, 1121-22, 103 S. Ct. 3517, 3518 (1983) (<u>per</u> <u>curiam</u>) (holding <u>Miranda</u> warnings not required where suspect agreed to accompany police to the station house and left after a brief interview). Although, at the suppression hearing, Giorgio testified Perez would have been arrested had he refused to accompany the detectives, "the initial determination of custody depends on the objective

_____

[3](...continued)

offense "may not thereafter raise independent claims relating to the deprivation of constitutional rights that occurred prior to the entry of the guilty plea." <u>Tollett v. Henderson</u>, 411 U.S. 258, 267, 93 S. Ct. 1602, 1608 (1973). However, "when state law permits a defendant to plead guilty without forfeiting his right to judicial review of specified constitutional issues, the defendant is not foreclosed from pursuing those constitutional claims in a federal habeas corpus proceeding." <u>Lefkowitz v. Newsome</u>, 420 U.S. 283, 293, 95 S. Ct. 886, 891-92 (1975). Pursuant to New York Criminal Procedure Law § 710.70(2), a criminal defendant may appeal an adverse decision on a pretrial motion to suppress evidence, despite conviction upon guilty plea. <u>See</u> <u>United States ex rel. Sanney v. Montanye</u>, 500 F.2d 411, 414 (2d Cir. 1974) (holding habeas petitioner did not waive constitutional claims arising from "illegal interrogation," including claim challenging admissibility of statements made without <u>Miranda</u> warnings, because of guilty plea), <u>cert.</u> <u>denied</u>, 419 U.S. 1027, 95 S. Ct. 506 (1974). Accordingly, Perez, having sought, unsuccessfully, to suppress his statements to law enforcement agents prior to pleading guilty, has not waived his right to challenge the admissibility of those statements through a habeas corpus petition.

circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." Stansbury v. California, 511 U.S. 318, 323, 114 S. Ct. 1526, 1529 (1994) (per curiam). That the police met Perez at the probation office, where he came for a scheduled appointment, does not render their interaction custodial. "[A]ny compulsion he might have felt from the possibility that terminating the meeting would have led to revocation of probation was not comparable to the pressure on a [physically restrained] suspect who is painfully aware that he literally cannot escape a persistent custodial interrogator." Minnesota v. Murphy, 465 U.S. 420, 433, 104 S. Ct. 1136, 1145 (1984). Moreover, Perez's probationary status does not render police questioning of him custodial per se. See Mathiason, 429 U.S. at 495, 97 S. Ct. at 714 (finding parolee defendant was not in custody).

At no point prior to giving Miranda warnings did police officers handcuff Perez or tell him he could not leave. Though he relinquished his car keys to his wife, the law enforcement agents told Perez's wife she could come to the 23rd police precinct to see her husband. The detectives placed Perez in an unguarded interview room at the precinct, but Miranda warnings are not required "simply because the questioning takes place in [a] station house, or because the questioned person is one whom the police suspect." Id. Considering the totality of the circumstances, the Court cannot find the police restrained Perez's freedom of movement to a "degree associated with a formal arrest." See Beheler, 463 U.S. at 1125, 103 S. Ct. at 3520.

Moreover, law enforcement agents did not subject Perez to an interrogation prior to giving him Miranda warnings. For Miranda purposes, an "interrogation" includes "express questioning" and "any words or actions . . . the police should know are reasonably likely to elicit an incriminating response from the suspect." Rhode Island v. Innis, 446 U.S. 291, 301, 297 100 S. Ct. 1682, 1689-90 (1980). Where a suspect is "not subjected to compelling influences, psychological ploys, or direct questioning,"

9

voluntary statements to police cannot be considered as elicited from an interrogation.  Arizona v. Mauro, 481 U.S. 520, 529, 107 S. Ct. 1931, 1936-37 (1987).

        Before Giorgio displayed the three photographs to Perez, he did not ask any questions, but simply stated he would show Perez some photographs.  Upon seeing the photographs, Perez, who had not yet been informed of the nature of the detectives' investigation, volunteered that he knew the men.  Giorgio remained silent.  Based on the record before the Court, there is no evidence the investigator placed the photographs before Perez to compel or trick him to speak.  Further, no evidence exists to suggest that the investigator should have known Perez would likely make an incriminating response upon seeing the photographs.  In fact, Perez's statement – acknowledging that he knew the three men in the photographs – was not incriminating "in any meaningful sense of the word" in that it was neither inculpatory nor used to "prove guilt by implication."  See Miranda, 384 U.S. at 477, 86 S. Ct. at 1629.

        As Perez was not subjected to custodial interrogation, prior to receiving Miranda warnings, the state trial court's decision, allowing Perez's statements to law enforcement agents to be admitted at trial, cannot be said to be "contrary to, or involved an unreasonable application of, clearly established Federal law" or "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).  Accordingly, Perez is not entitled to habeas corpus relief, on this ground of his petition.

## II.  Excessive Sentence[4]

        Perez contends his sentence, to a determinate term of 23 years' imprisonment, is "harsh and excessive" because he: (1) "did not participate in the killing[s]"; (2) "never knew that his alleged accomplices were planning anything more than a robbery"; and (3) received a longer sentence than the

_____

        [4] Though Perez has not exhausted this claim, a federal district court may deny a claim for habeas corpus relief "on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State."  28 U.S.C. § 2254(b)(2).

"get away driver, who was in the same position" as Perez.  The New York State Supreme Court convicted Perez of first-degree assault, a class B violent felony.  See New York Penal Law § 120.10(4); New York Penal Law §70.02(1)(a).  Under New York law, at the time of Perez's conviction and continuing to the present, an individual convicted for this crime faces a determinate sentence of imprisonment of at least five, but no more than 25 years.  See New York Penal Law § 70.02(3)(a).

The Second Circuit has held that, where an inmate's "sentence is within the range prescribed by state law," a challenge to that sentence presents "[n]o federal constitutional issue" for habeas corpus review.  White v. Keane, 969 F.2d 1381, 1383 (2d Cir. 1992) (per curiam).  As Perez's sentence falls within the range prescribed by state law, his excessive sentence claim presents no federal constitutional issue for which habeas corpus relief may be granted.

## RECOMMENDATION

For the reasons set forth above, I recommend that Perez's petition for a writ of habeas corpus, Docket Entry No. 1, be denied.

## FILING OF OBJECTIONS TO THIS REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b)(2) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report to file written objections.  See also Fed. R. Civ. P. 6.  Such objections, and any responses to objections, shall be filed with the Clerk of Court, with courtesy copies delivered to the chambers of the Honorable William H. Pauley III, 500 Pearl Street, Room 2210, New York, New York 10007, and to the chambers of the undersigned, 40 Centre Street, Room 540, New York, New York 10007.  Any requests for an extension of time for filing objections must be directed to Judge Pauley.  FAILURE TO FILE OBJECTIONS WITHIN FOURTEEN (14) DAYS WILL RESULT IN A WAIVER OF OBJECTIONS AND WILL PRECLUDE APPELLATE REVIEW.  See Thomas v. Arn, 474 U.S. 140, 470 (1985); IUE AFL-CIO Pension Fund v. Herrmann,

9 F.3d 1049, 1054 (2d Cir. 1993); <u>Frank v. Johnson</u>, 968 F.2d 298, 300 (2d Cir. 1992);   <u>Wesolek v.</u>

<u>Canadair Ltd.</u>, 838 F.2d 55, 58-59 (2d Cir. 1988); <u>McCarthy v. Manson</u>, 714 F.2d 234, 237-38 (2d Cir.

1983).

Dated: New York, New York
     June 22, 2010

Copies mailed to:

Javier Perez
Lea L. La Ferlita, Esq.

Respectfully submitted,

Kevin Nathaniel Fox
KEVIN NATHANIEL FOX
UNITED STATES MAGISTRATE JUDGE

12